Constantine Thomas and Marie Thomas v. Commissioner. Constantine Thomas v. Commissioner.
Thomas v. Commissioner
Docket Nos. 47178, 47179.
United States Tax Court
T.C. Memo 1959-157; 1959 Tax Ct. Memo LEXIS 91; 18 T.C.M. (CCH) 676; T.C.M. (RIA) 59157; August 12, 1959
*91 Charles H. Morin, Esq., for the petitioners. Paul J. Henry, Esq., and Chester M. Howe, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: These proceedings are now before us for the third time. The respondent determined the following deficiencies and additions to tax for fraud for the years 1943 to 1948: Deficiency
Addition
Constantine Thomas
1943
$2,425.72
$1,212.86
1944
746.53
373.27
Constantine and
Marie Thomas
1945
6,853.75
3,426.88
1946
1,287.95
643.98
1947
7,329.34
3,664.67
1948
5,441.12
2,720.56
Constantine Thomas filed individual income tax returns for the calendar years 1943 and 1944. Constantine and Marie Thomas filed joint returns for the calendar years 1945 to 1948, inclusive. The returns were filed with the collector of internal revenue at Boston, Massachusetts. A stipulation of facts, with exhibits, was filed at the first hearing, and testimony and other exhibits were introduced. The deficiencies were determined by the net worth and expenditures method. The computation of net worth is agreed upon except for the amount of cash on hand at the beginning and *92 end of each year. The issues are the amount of such cash on hand, whether the petitioners received nontaxable gifts, and whether any part of the deficiencies is due to fraud with intent to evade tax. In a Memorandum Findings of Fact and Opinion filed February 24, 1955, ( T.C. Memo 1955-46 [14 TCM 156;]) we sustained with minor adjustments the deficiencies and additions to tax determined by the respondent. The Court of Appeals for the First Circuit, (232 Fed. (2d) 520), reversed on April 12, 1956, and remanded the cases for the admission of further evidence, for findings as to the petitioners' cash on hand at the commencement and termination of each of the taxable years, for findings of a likely source of taxable income, and for other proceedings not inconsistent with its opinion. Pursuant to the foregoing instructions a further hearing was held and additional evidence was received. Thereupon we held that since the respondent had not proved a likely source of taxable income independent of the fact that the taxpayers' net worth had increased, the deficiencies and additions to tax could not be sustained. (T.C. Memo. 1957-244, filed December 31, 1957 [16 TCM 1123;]). *93 Subsequently the Supreme Court in United States v. Massei, 355 U.S. 595 (1958) commented that proof of a likely source was not necessary in every net worth case, since, if all possible sources of nontaxable income were negatived, there would be no need for proof of a likely source. The Court of Appeals for the First Circuit, (261 Fed. (2d) 643, Nov. 19, 1958), thereafter reversed our decisions for the taxpayers and remanded for a determination as to whether the respondent has borne the burden of negativing by a preponderance of evidence that certain alleged gifts of cash were the source of the increases in net worth. In a further memorandum on an application for rehearing, the Court of Appeals, (261 Fed. (2d) 645, Dec. 18, 1958), made the comment that since the only source of nontaxable income alleged by the taxpayers was the cash gifts referred to, this is the only source the respondent must negate, and if this is done we will reach the question of cash on hand at the beginning and end of each of the taxable years as mentioned in the first remand. We have reexamined the evidence in the light of the opinions of the Court of Appeals, and *94 have made additional and revised findings of fact from such evidence. Findings of Fact The stipulated facts are incorporated by this reference. The petitioners are husband and wife. They reside in Chelmsford, Massachusetts. During the taxable years 1943 to 1948, inclusive, Constantine Thomas, sometimes known as Charles Thomas, owned 97 per cent, and Marie Thomas owned 2 per cent of the stock of Thomas, The Master Cleaner, Inc., hereinafter referred to as the corporation, a Massachusetts corporation doing business in Lowell, Massachusetts. Thomas was president and treasurer of the corporation and in complete control of the business carried on, which was dry cleaning and the repair, storage and sale of furs. The corporation filed Federal income tax returns with the collector of internal revenue at Boston upon an accrual basis and covering calendar years. Constantine Thomas was born about 1894 and came to the United States from Greece at the age of 10 years. He has since resided in the United States. From about 1918 until about 1932 he engaged in various business ventures including the taxicab business, dealing in used cars, operating a restaurant, and investing in a hotel. *95 About 1929 he started a dry cleaning business under the name of Highland Cleaners and Dyeing. He sold this after operating it for a year or two. He also worked in a brokerage firm and in a foreign exchange bank. Thomas also invested in stocks on margin or on borrowed funds and had an account with a brokerage firm in Boston. In 1929 he withdrew from the stock market with a substantial amount of cash and a number of shares of different stocks. Thomas borrowed on several occasions from the Union Bank of Lowell, or its predecessor, herein referred to as the bank. On February 5, 1930, Thomas borrowed $1,546.13 from the bank, pledging as security several stocks. He borrowed additional amounts in subsequent months increasing the loans to a total of $11,970.55 by July 1931. The stocks declined in value and the bank asked for more collateral which Thomas refused to furnish at the then current market. The bank took over the collateral and in 1932 charged off $8,926.85 as a loss. In May 1932 Thomas borrowed $272.68 from the bank at 6 per cent interest. This loan was continued until June 1933. In 1932 Thomas started his dry cleaning business which was incorporated in 1935 as Thomas, *96 The Master Cleaner, Inc.
Constantine and Marie were married in 1938. Marie's father, Christos Vangos, was manager of a confectionery establishment in Easthampton, and Marie's mother worked in that business. At the time of the marriage of the petitioners, Vangos gave them money to assist in buying a home. Marie helped Constantine in his business for about a year after their marriage. In February 1936 Thomas opened a savings account with the Central Savings Bank of Lowell, depositing $1,650. After another deposit and with interest the balance in May 1938 was $1,896.82. Thomas withdrew over $1,700 in May 1938, made other deposits later and withdrew $350 in May 1940, leaving a balance of $48.22. The balance on January 1, 1943 was $50.54. In December 1943, $2,900 was deposited. In December 1949 the account was transferred to Thomas in trust for one of his daughters. Another savings account was opened by Thomas in trust for another daughter in May 1943 with a deposit of $500. Another deposit of $2,900 was made to this account in December 1943. There were no deposits or withdrawals to or from these accounts after 1943 and before 1949, but interest was added. In April 1940 the corporation *97 sought a loan of $4,500 from the Reconstruction Finance Corporation (hereinafter referred to as the R.F.C.) to provide improvements and expand fur storage facilities. Thomas considered that an R.F.C. loan could be had at a low interest rate. The Union National Bank of Lowell agreed to participate up to 20 per cent in the loan, provided the bank receive the amount of $400 as a compromise offer in full payment of the loan to Thomas charged off in 1932 in the amount of $8,926.85. Thomas paid the amount of $400 in installments at the rate of $7 per month beginning in June 1940 and making a final lump sum payment of $148 in December 1943. The corporation was granted a loan of $4,500 at 5 per cent. This was reduced by installment payments to $3,586.83 on July 13, 1941. Thomas pledged certain policies of insurance on his life as collateral for the R.F.C. loan to the corporation. Thomas, individually, borrowed $800 from the bank in May 1940 at 5 per cent and paid the loan in January 1942. He deposited as collateral 14 shares of Wright Aeronautical Corporation common stock. In March 1941 the corporation borrowed $600 from the bank at 6 per cent. This loan was increased to $1,000 in May and *98 was paid in June 1941. In April 1941, the corporation applied to the R.F.C. for another loan of $1,800 for the purchase and installation of 3 pieces of equipment. The application contained a balance sheet of the corporation as of December 31, 1940, and was accompanied by a statement of Thomas' personal assets. The corporation's financial statement showed cash on hand $1,272.81, inventory $4,537, total assets $22,353.02, current liabilities of $3,837.37, and a chattel mortgage to the R.F.C. for $3,960. Thomas' salary was stated to be $2,500 a year. The ownership interest was shown as common stock $5,000; surplus, donated, $8,438.36; and undivided profits, $1,117.29. This statement gave the following information of the business: 1936
1937
1938
1939
1940
1941 to 3/31
Net sales
$25,872
$27,563
$25,441
$27,367
$27,912
$6,488
Profit or loss before
834
1,067
2,124
2,033
2,340
depreciation
Depreciation
1,010
1,297
1,574
1,569
1,722
Net profit or loss
- 176
- 230
550
464
618
Dividends paid
None
None
None
None
Salaries to officers
4,000
1,118
2,000
3,000
2,500
The statement of Thomas' assets and liabilities as of *99 April 26, 1941 shows cash on hand $200; securities $1,660; real estate valued at $11,000 (having an assessed value of $7,000); furniture $3,000; and cash surrender value of life insurance, $647; and shows liabilities of $5,150. Thomas signed a declaration that this was a true and accurate statement of all his personal assets and liabilities other than his interest in the corporation. The corporation's R.F.C. loan was increased to $5,400 in July 1941 and the interest rate was reduced to 4 per cent. Installments were paid reducing the balance to $3,070.30 by November 1942. In November $1,000 was paid on principal and in December the balance of $2,070.30 was paid. Thomas filed an income tax return for 1940 showing no tax due. He filed no return for 1941. His return for 1942 showed a tax of $33, of which two quarterly installments were paid in March and June 1943. His return for 1943 reported total income of $2,658 consisting of salary of $2,550 and dividends of $108. Tax withheld was greater than the tax due and a refund was made. His return for 1944 reported income of $2,652.50, consisting of salary $2,550 and interest $102.50. The petitioners' joint return for 1945 reported salary *100 of $5,000 and dividends or interest of $500.62. Their joint return for 1946 reported salary $5,200, dividends $579.40, and interest $213.44. Their joint return for 1947 reported salary $5,100, dividends $957.50, and interest $613.47. Their joint return for 1948 reported salary $4,940, dividends $1,186.61, interest of $669.80, and long-term capital gain of $80. In December 1943 Vangos made two gifts of $3,000 each for the benefit of the petitioners' two children. $2,900 of each gift was deposited in a savings account. In 1944 Vangos and his wife came to live with the petitioners. In the petitioners' income tax returns for 1946, 1947 and 1948, Christos and Jatina Vangos, parents of Marie, were claimed as dependents. Vangos engaged in no income producing activities in those years. Vangos died in 1953. In Probate Court his estate was appraised at $45,209.84, consisting of cash $2,733.92; Baltimore & Ohio bond $4,505; Government bonds $30,617.50; notes $6,143.42; and personal property $1,110. At the beginning of each of the taxable years the petitioners had certain bank balances, bonds and stocks and loans receivable and certain liabilities. The amounts of these assets, other than *101 cash on hand, are stipulated. Their assets included real estate listed at a stipulated valuation of $5,500 and equity in the corporation listed at $5,000. The following table is a summary of the stipulated assets and liabilities at the times stated, exclusive of real estate, equity in the corporation and cash on hand. Stocks and bonds are shown at cost. Loans receivable refers to amounts due from the corporation to the petitioners. 1-1-43
1-1-44
1-1-45
1-1-46
Checking Acct.
$ 4,337.28
Savings Accts.
$ 50.54
$ 6,855.06
$ 9,443.65
9,548.17
Bonds
5,000.00
8,000.00
11,825.00
15,900.00
Stocks
2,290.79
2,290.79
2,290.79
9,808.81
Loans Receivable
3,002.45
1,794.86
1,128.79
TOTAL
$10,343.78
$18,940.71
$23,559.44
$40,723.05
Due to Corporation
1,494.50
Due Greek War Relief
NET
$10,343.78
$18,940.71
$22,064.94
$40,723.05
1-1-47
1-1-48
12-31-48
Checking Acct.
$ 4,696.22
$ 3,858.67
$ 5,722.60
Savings Accts.
9,687.19
9,828.98
9,973.58
Bonds
15,900.00
20,900.00
20,900.00
Stocks
17,318.81
17,318.81
16,076.52
Loans Receivable
19,868.75
41,325.00
TOTAL
$47,602.22
$71,775.21
$93,997.70
Due to Corporation
282.34
Due Greek War Relief
5,000.00
5,000.00
NET
$47,319.88
$66,775.21
$88,997.70
*102 The petitioners' personal and living expenses in the taxable years are stipulated as follows: 1943
$2,779.40
1944
2,629.08
1945
3,300.65
1946
4,631.99
1947
6,156.79
1948
5,699.78
On March 26, 1946, and on August 29, 1949, the petitioners submitted net worth statements to the Department of State, Visa Division, for the purpose of satisfying the immigration authorities as to their ability to provide financially for a relative they brought to the United States from Greece. These statements showed the following assets (securities being listed at cost): March 26,
August 29,
1946
1949
Checking account
$ 9,253.54
$ 2,868.58
Savings accounts
9,551.93
10,038.91
Bonds
15,900.00
20,900.00
Stocks
10,383.02
15,028.02
Total current assets
$45,088.49
$ 48,835.51
Due from corporation
1,128.79
41,325.00
Stock in corporation
4,950.00
4,950.00
Real estate
10,000.00
10,000.00
Total assets
$61,167.28
$105,110.51
Current or long term
debts
none
none
The listing of stocks showed the following stocks with cost as unknown. The costs of these stocks as shown on other stipulated lists are given below. These stocks were *103 acquired between 1929 and 1938 and held until 1948 when one of them (Maraciabo) was sold. Maraciabo Oil Exploration Corp.
$1,242.29
Radio Corp. of America
56.25
Wright Aeronautical Corp.
992.25
These statements estimated income for the respective years 1946 and 1949 as follows: 1946
1949
Salary from corporation
$ 5,000.00
$ 5,000.00
Share in net profits
6,930.00
Bank interest
105.75
148.00
Treasury bond interest
225.00
225.00
Postal Savings interest
75.00
50.00
Corporation bond interest
200.00
Dividends from corpora-
tions
568.15
1,186.61
Total
$12,903.90
$ 6,809.61
These statements showed that the petitioners acquired United States Savings Bonds, Series E, registered in both their names, as follows: Face Amount
Date Acquired
Cost
$1,500
1/1/43
$1,125
1,500
3/1/43
1,125
1,000
4/1/43
750
1,000
1/1/44
750
1,000
3/1/44
750
2,000
5/1/44
1,500
1,000
12/1/44
750
200
6/1/45
150
$6,900 Each of the petitioners swore that each of these statements "has been examined by us and to the best of our knowledge and belief is true, correct and complete." Each statement was supported *104 by an accountant's certificate. In May 1945 the petitioners acquired the following stocks registered in the name of Marie Thomas: Shares
Security
Cost
50
American Light & Traction Co.
$1,015.29
60
Bethlehem Steel Corp.
1,620.23
10
Chrysler Corp.
1,143.81
50
United Aircraft Corp.
1,453.79
$5,233.12
In December 1945 the petitioners acquired the following stocks registered in the name of Constantine Thomas: Shares
Security
Cost
10
Anaconda Copper Mining Co.
$ 440.30
10
Kennecott Copper Corp.
488.10
20
Phelps-Dodge Corp.
747.80
20
Republic Steel Corp.
608.70
$2,284.90
In 1946 the petitioners acquired the following stocks registered in the name of Charles Thomas: Date
Shares
Security
Cost
3/4
1
Christiana Securities Co.
$2,865
4/6
75
Am. Radiator & Standard
Sanitary Corp.
1,575
9/20
100
Am. Radiator & Standard
Sanitary Corp.
1,400
12/2
1
First National Bank of
N. Y.
1,670
$7,510
In 1947 Thomas purchased 15 Bendix automatic washing machines and opened a laundromat operation as an addition to the corporation's business. The investment in these *105 machines was not entered on the corporation's books until the end of 1948. The amount of $2,936.25 was then added to the machinery account. These were coinoperated machines. A girl was placed in charge of them who turned over to the bookkeeper the receipts from this operation. The corporation's tax returns reported the following: Stock &
Year
Gross Sales
Net Income
Assets 12/31
Surplus 12/31
1943
$ 47,536.91
$2,391.03
$21,841.44
$16,844.93
1944
63,997.72
5,910.65
27,802.46
22,123.99
1945
77,983.10
8,633.46
38,329.19
29,506.79
1946
114,453.91
7,315.14
47,611.77
35,997.61
1947
94,364.48
3,157.26
65,590.56
31,163.18
1948
113,984.22
5,584.13
81,048.32
26,155.60
Constantine Thomas had $4,200 in cash on hand at the beginning of 1943, $1,500 cash on hand at the beginning of 1944, and $100 cash on hand at the end of 1944. Constantine and Marie Thomas had $100 in cash on hand on January 1, 1945. They received a gift of $25,000 in 1945 from Vangos. At the end of 1945 they had $8,640 cash on hand. At the end of 1946 they had $3,400 in cash on hand. At the end of 1947 they had $100 in cash. At the end of 1948 they had $100 *106 in cash on hand. No part of the deficiencies was due to fraud with intent to evade tax. Opinion In the taxable years the petitioners had substantial increases in their apparent net worth, increases not accounted for by their reported income nor the income reported by the corporation which they controlled. The respondent determined deficiencies on the basis of the increases in net worth and determined additions to the tax for fraud. The parties have stipulated the net worth at the beginning and end of each year except for the amount of cash on hand, and have stipulated the amount of nondeductible living expenses for each year. The respondent assumed that the petitioners had no cash on hand and we sustained the respondent's determination generally, in our first opinion. The Court of Appeals, in remanding the case, 232 F. 2d 520, 525, made the following comment: "It seems to us that this evidence is primarily negative in character - that is, it may tend to prove that the taxpayer had no large hoard of cash, but it would seem to be completely ineffective to establish that he had no cash at all. "If taxpayer had cash substantially in the amounts indicated below there *107 would be no taxable increase in net worth for the corresponding years or for any previous years: "1943
$ 2,700
1944
5,800
1945
22,000
1946
27,000
1947
46,000
1948
67,000
"Certainly, it seems to us, the Tax Court would not be clearly erroneous in finding that the evidence indicated the taxpayer did not have cash on hand in the amount of $22,000 as of January 1, 1943. But we believe that the Tax Court was clearly in error when it found that the taxpayer did not have $5,800, or $2,700, or, in fact, any cash on hand at all as of the same date. We find no evidence in the record even tending to support such a finding, nor it is appropriate for the Tax Court to fix an arbitrary figure unsupported by the evidence simply because the taxpayer has made no affirmative showing to the contrary. "A statement of taxpayer's net worth as of April 26, 1941, shows a figure of $200 for cash on hand. If this evidence is thought to be effective in a negative sense to help show that the taxpayer did not have a large hoard of cash as of January 1, 1943, we do not understand why it should not be equally effective to show that the taxpayer probably did have a moderate or small *108 amount of cash on hand. "We think it clear, therefore, that respondent's determination that the taxpayer had no cash on hand was sustained not because the facts of the case warrant such an inference, but merely because the taxpayer had made no affirmative showing to the contrary. "If respondent is to be permitted to make an arbitrary guess as to the proper figure for the cash on hand account, there would seem to be no reason as a general proposition why similar guesses should not be made as to each of the constituent elements comprising the taxpayers' net worth. Under these circumstances the entire net worth technique becomes nothing but an elaborate accounting sham lending a semblance of system and logic to a determination of deficiency which could have have no greater validity than the original guesswork upon which it was based." The total amount of alleged unreported income shown by the increases in net worth plus living expenses for the six taxable years is approximately $67,000. Thomas now says that he had $42,000 in cash on hand at the beginning of 1943 and that the petitioners received $25,000 as a gift from Marie's father, Christos Vangos, in 1944 or 1945. If these statements *109 are both true, the increase in net worth is substantially accounted for by funds nontaxable in the years before the Court. The cash on hand at the beginning of 1943 is alleged to have been derived from a brokerage account which Thomas had with a securities dealer in 1929. Thomas said he closed this account before the stock market collapse and drew out some $20,000 to $22,000 in cash and a number of stocks. He says he held these securities for the intervening years and gradually liquidated them between 1936 and 1941, disposing of the last of them in late 1941 or 1942, and that he kept the cash in a safe at his home in currency because he intended to return to Greece and wanted all the cash he could get for this purpose. At the first hearing Thomas made no assertion as to the amount of cash on hand on January 1, 1943. He described getting out of the stock market in 1929 with a substantial amount of cash and securities, but did not then say that any of this remainded on hand in cash at the beginning of 1943. There is some corroboration of his testimony as to 1929. A witness formerly connected with the brokerage firm testified that Thomas closed his account in 1929 and drew $20,000 *110 in cash and a number of good stocks. Some stocks also appear in later financial statements as having been acquired at this time. On the remand a further hearing was held. Thomas testified, but during the hearing made no affirmative statement as to the amount of cash on hand at the beginning of each year. After both parties rested, the Court recalled Thomas and questioned him in an effort to ascertain the amount he professed to have in cash at the beginning of 1943. He then told of holding securities through the years following 1929 and liquidating them from time to time from 1936 on, disposing of the last of them in 1941 or early in 1942 and having in cash approximately $42,000 at the end of 1942. The cash on hand remaining at the beginning of each of the other taxable years is alleged by the petitioners to be as follows: 1944
$39,281.67
1945
36,180.86
1946
44,723.22, including $25,000 gift
1947
39,487.24
1948
20,546.21
We are unable to accept in full the story of the cash hoard at the beginning of 1943. The possession of money in 1929 does not prove possession of similar amounts in 1942. This claim is inconsistent with the financial borrowings of Thomas *111 in the years between 1930 and 1943 as shown by bank records and other evidence. Also it is contradicted by the financial declaration Thomas made to a Government agency, the R.F.C., in 1941, and the sworn statement of financial condition made in 1946 to the State Department. The bank records disclose that Thomas borrowed some $1,500 in February 1930, $2,000 more in March, $2,500 more in April and over $5,000 in May. The loan reached a total of $11,970.55 in 1931. The loan was secured by collateral consisting of stocks deposited by the borrower. When the collateral declined in value and Thomas refused to furnish more, the bank in April 1932 took over the collateral and charged off the balance. From May 1932 to June 1933 Thomas borrowed some $260 to $270 at 6 per cent from the bank. Thomas commenced his present dry cleaning business in 1932, and incorporated it in February 1935. The capital stock is shown at $5,000. In the years 1936 to 1940 the corporation's sales were relatively steady, ranging between $25,000 and $29,000 per year. Thomas' salary was $4,000 in 1936 and was less in 1937 and thereafter until 1945. Prior to 1943 no dividends were distributed and only small profits *112 were reported. In 1936 Thomas started a savings bank account with $1,650 and this was increased to $1,896.82, but in May 1938 he drew out most of this. The petitioners were married in that year. At the beginning of 1940 this savings balance was $390.49. In May 1940 Thomas drew $300 from this savings account, borrowed some $800 from the bank at 5 per cent on a collateral loan, depositing 14 shares of Wright Aeronautical stock, and the corporation at the same time borrowed $4,500 from the R.F.C. and the bank at 5 per cent, depositing life insurance policies on Thomas' life as collateral. To get this loan Thomas personally agreed to pay the bank $400 at $7 per month in compromise of the old obligation charged off in 1932. At the end of 1940 the corporation had $1,272.81 in cash, total assets listed at $22,353.02, current liabilities $3,837.37, and owed $3,960 on the R.F.C. loan, and its common stock, surplus and undivided profits were shown as amounting to $14,555.65. In March 1941 the corporation borrowed $600 from the bank on a 6 per cent 30-day loan. In April 1941 the corporation applied to the R.F.C. for an $1,800 loan to purchase and install 3 pieces of equipment, offering a lien *113 on the machinery and equipment and a pledge of life insurance on Thomas' life. Thomas furnished a statement of his personal assets and liabilities other than his interest in the corporation. Apparently the loan was granted, for in July 1941 the R.F.C. loan to the corporation, which had been reduced by payments to $3,586.83, was increased to $5,400 and the interest rate was reduced from 5 per cent to 4 per cent. In the meantime the corporation's 6 per cent loan from the bank was increased to $800 in April 1941 and to $1,000 in May and was paid off in June 1941. At the beginning of 1942 the savings account had a balance of $49.67, Thomas owed $281 on the $400 compromise agreement and $512.57 on his collateral loan. The corporation owed $4,829.16 on the R.F.C. loan. In January 1942, Thomas paid the collateral loan. The corporation reduced the R.F.C. loan to $3,070.30 by November 12, paid $1,000 on November 23, and paid off the balance in December. Thomas reduced the compromise agreement balance to $204 by the end of 1942. In January 1943 Thomas invested $1,125 in United States Series E Bonds, in March 1943 another $1,125 and in April 1943 another $750. He paid off the compromise *114 balance ending with a lump sum payment of $148 in December 1943. This financial history indicates a shortage of cash for long periods. Some of the stocks were pledged to the bank and sold by it in partial repayment of loans. From May 1940 until the end of 1942 Thomas borrowed extensively on his own account or for the corporation. If Thomas had a substantial hoard it is incredible that he would borrow at 6 per cent or 5 per cent for current needs. The financial pinch seems to have eased somewhat in 1942, for in the last two months of that year the corporation paid off $3,070 due the R.F.C. Total debt reduction by Thomas and the corporation was about $5,400 in 1942. In the first four months of 1943 Thomas invested $3,000 in Government Series E bonds and later in 1943 the last debt of $204 was paid. The most reasonable conclusion from the record is that this was the consequence of improved business arising out of wartime conditions, rather than the use of hoarded cash, for the corporation's tax return shows sales of over $47,000, in 1943, an increase of about 70 per cent over 1939 and 1940 sales. The existence of so large an amount of cash on hand at the beginning of 1943 is also *115 contradicted by the financial statement furnished by Thomas to the R.F.C. in April 1941 in support of his request for an additional or increased loan to the corporation. He declared that it was a true and accurate statement of all personal assets and liabilities other than his interest in the corporation. It disclosed cash of $200, 14 shares of Wright Aeronautical stock valued at $1,260 and other securities of the approximate value of $400. Some 20 months later, at the beginning of 1943, it is stipulated that Thomas' assets include 14 shares of Wright Aeronautical stock, then valued at $992.25, 5 shares Radio Corporation of America, valued $56.25, and 90 shares of Maraciabo Oil Ex. Co. valued at $1,242.29, as well as bonds valued at $5,000. The stipulated value of real estate declined from $11,000 in April 1941 to $5,500 at the end of 1942, possibly indicating a sale of land and investment in bonds or payment of liabilities shown as $5,150 on the earlier statement. At the beginning of 1943 Thomas owed $204 under the compromise agreement, but all other debts appear to have been paid. The equity in the corporation appears to have changed but little in the two years 1941 and 1942. Disregarding *116 the items of appreciation in the values of securities, investment in furniture, life insurance cash values and equity in the corporation and without considering any cash on hand at the beginning of 1943, there was an apparent improvement in Thomas' financial position of over $7,000 in these 20 months. Thomas filed no return for 1941 and if no return was due, his income did not exceed $2,300, most of which must have gone for living expenses. His return for 1942 showed a tax of $33 which would be correct for an income of $2,130 and most of this must have gone for living expenses. Thus the apparent improvement in Thomas' financial position was greater than his apparent income for this period even if he had no cash on hand at the beginning of 1943. There has been no contention advanced on brief for the petitioners that Thomas' financial statement made to the R.F.C. in 1941 was false and that he concealed assets of several thousand dollars. If his 1941 statement is true and his present assertion that he had $42,000 in cash on hand on January 1, 1943, is also true, he must have had a financial improvement of nearly $50,000 in this 20-month period. In effect this would mean that the item *117 of "Other Securities" valued at $400 in April 1941 had suddenly swelled into more than $40,000 in cash, $5,000 in bonds, $3,000 in loans, and $1,300 in securities. Also, the existence of so large a hoard on January 1, 1943, is inconsistent with the stipulated facts considered with the petitioners' statement of assets as of March 26, 1946. This statement sworn to by the petitioners as true, correct and complete shows a checking account and certain savings accounts but no other cash on hand. There is no reason to suppose this statement omitted a hoard of undisclosed cash. Yet it is the petitioners' contention that they had $44,700 in cash at the beginning of 1946 and over $39,000 at the end of that year. The above analysis, although not there set forth, was the basis for the finding in our first Memorandum Findings of Fact and Opinion that Thomas had no cash on hand on January 1, 1943. The Court of Appeals declared this to be clearly in error. We have reexamined the evidence. The net worth statement dated March 26, 1946, and verified by an accounting firm, shows investment by Thomas of $3,000 in United States bonds, Series E, in the first 4 months of 1943. While the investments may *118 have been made out of corporation earnings or moneys otherwise acquired after 1942, it is possible that the $3,000 invested in Government bonds in early 1943 came from cash on hand on January 1 of that year. Making the estimate most favorable to the petitioners justified by the evidence available, we find that Thomas had $4,200 in cash on hand on January 1, 1943. A cash accumulation of $4,200 on January 1, 1943, would account for the net unreported income otherwise shown for 1943 and leave approximately $1,500 of cash on hand on January 1, 1944. The unreported income otherwise shown for 1944 would not be accounted for in full and the cash fund would be exhausted by the end of that year. Cash on hand on January 1, 1945, we find to be not more than $100 held as pocket money. The petitioners' allegation that Marie's father, Vangos, gave them a substantial amount of cash in 1945 is more plausible and some supporting evidence appears in the record. Marie Thomas testified at the first hearing that her father gave the petitioners some money at the time they were married in order to help him buy a home, that he gave them $6,000 in 1943 for the benefit of their two children, of which *119 $2,900 was put in a savings account for each child and $100 was spent for clothing or other things for each, that he gave them $25,000 in 1945 and $5,000 and $10,000 later, and that at the time of the $25,000 gift, she turned it over to her husband to invest the money. Thomas testified about a gift of $25,000 in 1944 or 1945, but made no mention of any later gifts. Vangos died in 1953 and left an estate appraised at $45,000 which included some $30,000 in Government bonds and over $2,000 in cash. In our first opinion we accepted the testimony of the gift of $6,000 which was corroborated by savings account records, but did not consider the evidence sufficient to prove a later gift. The respondent, to prove that such a gift as $25,000 could not have been made, showed by records of the collectors of internal revenue in Massachusetts and in New Hampshire where Vangos formerly lived, that Vangos filed no income tax returns from 1933 onward, and points out that the petitioners in their returns for 1946, 1947 and 1948 claimed Vangos and his wife as dependents. This evidence is of a negative character and we can not say that it disproves any such gift. On the other hand, comparison of *120 the financial statement of March 26 with the stipulated non-cash assets as of the beginning and end of 1945 shows acquisition of several substantial investments in 1945 and the probability of substantial cash on hand at the end of the year. The schedule of securities owned as of March 26, 1946 shows the purchase on May 4, 1945, of 4 different stocks registered in the name of Marie Thomas at a cost of $5,233.12. If such a gift was received from Marie's father it would be reasonable to suppose that the petitioners might invest some of it in her name. In December 1945, $2,284.90 was invested in stocks in the name of Constantine. In June $150 was invested in a U.S. Savings Bond. A checking account was opened and had a balance of $4,337.28 at the end of the year 1945. $4,075 was invested in other bonds in 1945. A loan from the corporation in the amount of $1,494.50 was paid and $1,128.79 additional was loaned to the corporation. This accounts for $18,700. The income reported on the petitioners' 1945 return less stipulated living expenses shows a net gain of $2,200. If the return was correct and a gift was received, it could have been in an amount in excess of the unreported income for *121 1945 as determined by the respondent. The sworn statement of assets and liabilities of the petitioners as of March 26, 1946, prepared by an accounting firm, can be compared with the stipulated facts showing all assets other than cash as of December 31, 1945, and December 31, 1946. From these figures, after omitting real estate and stock in the corporation, we can make the following comparison: Dec. 31, 1945
Mar. 26, 1946
Dec. 31, 1946
Cash
none
Checking Account
$ 4,337.28
$ 9,253.54
$ 4,696.22
Savings Accounts
9,548.17
9,551.93
9,687.19
U.S. Bonds
9,000.00
9,000.00
9,000.00
U.S. Savings Bonds
6,900.00
6,900.00
6,900.00
Common Stocks
9,808.81
12,673.81
17,318.81
Due from corporation
1,128.79
1,128.79
Total
$40,723.05
$48,508.07
$47,602.22
Owing to corporation
282.34
Net
$40,723.05
$48,508.07
$47,319.88
There is evidence in the statement of March 26, 1946, indicating that the petitioners may have had substantial cash on hand at the end of 1945. Between December 31, 1945 and March 26, 1946, the bank balance was increased by $4,916.26 and $2,865 was invested in stocks. With the $18,700 invested in 1945, these figures *122 sufficiently account for receipt of approximately $25,000 in 1945 and early 1946. We accept the petitioners' testimony and find that such a gift was received in 1945. After accounting for the investments and net income in 1945 we find that $8,640 in cash remained at the end of 1945. The adjusted gross income reported on the return for 1946 was $5,992.84 and the living expenses were stipulated to be $4,631.99. The petitioners' apparent gain in 1946 therefore was about $1,360. The cash on hand at the beginning of 1946 of $8,640 and noncash assets of $40,723 amount to $49,363. Adding the net gain for 1946 results in a total of $50,723. The corresponding noncash assets at the end of the year amounted to $47,320, and apparently about $3,400 in cash must have remained. In the first part of 1946 the checking account was increased by nearly $5,000 and $2,865 was invested in stock. In the last nine months of 1946, $4,645 was invested in stocks, about $1,400 was withdrawn from the corporation and the bank account was reduced by about $4,560. In 1947 and 1948 there were substantial increases in the petitioners' net worth not accounted for by nontaxable sources. The respondent has negated *123 the petitioners' contention that this came from cash on hand at the beginning of 1943 which was still on hand in 1947. These amounts can be recomputed starting with $3,400 of cash remaining at the beginning of 1947. This would be absorbed in the investments made in that year. Cash on hand at the end of 1947 we find amounted to not more $100than pocket money and the same amount of cash was held at the end of 1948. The burden of proof as to fraud is upon the respondent. Section 1112, Internal Revenue Code of 1939. This burden has not been met. Fraud requires proof by clear and convincing evidence. The respondent argues that the corporation may have been the source of the unreported income, that Thomas usually made the bank deposit of the cash receipts of the business and that he could have abstracted some of this cash to conceal corporate profits. Also, it is urged that the sales of furs must have been more profitable than the corporation's returns would indicate. These arguments were resolved against respondent in our second opinion in this case. On the entire record we are now of the opinion that the respondent has shown nothing beyond the fact that there was a substantial and unexplained *124 increase in net worth in 1947 and 1948 as the basis for determining fraud and that is not sufficient. L. Glenn Switzer, 20 T.C. 759 (1953). The additions to tax are not sustained. Decisions will be entered under Rule 50.